All right. Mrs. Cannon. May it please the court. My name is Patrick Cannon. I represent the Appellant Fintech Fund, FLP. There are a number of issues before the court today, specifically six raised by Fintech relating to the dismissal of its case on form non-convenience grounds, which was raised sous-spante by the district court, and then two raised by cross-appellant Ralph Horne claiming the district court erred in finding it had personal jurisdiction over Mr. Horne and that venue was proper in the Southern District of Texas. So does your client consider itself the winner or the loser here? The loser, Your Honor. Its case against the defendant was dismissed without having the opportunity to properly brief any arguments on the form non-convenience grounds. And that's actually the first issue that we have in this case, is that we're not able to find any Fifth Circuit Court of Appeals decisions, and there appears to be a split in the Fifth Circuit regarding whether or not a court may dismiss a case on form non-convenience grounds. Well, do you and Mr. Horne, I take it you don't agree that you should arbitrate this? Correct, Your Honor. According to the contract. Yes, Your Honor. We do not believe that the arbitration provision in this case is binding. And that gets to our second issue regarding the inconsistency between the arbitration provision and the form selection clause found in the agreement. Now as far as the binding nature of that contract, again, we believe that there is the cause of action brought by Fentech against Mr. Horne was under the Computer Fraud and Abuse Act and the Defendant Trade Secrets Act. We start from the proposition, you know, part of the obligation is to enforce the intent of the parties. I mean, the parties here are very sophisticated. They enter into an agreement. It's got all kind of interlocking clauses. I mean, it's very intentional. It's not accidental. I mean, it's there. So we don't just start from, you know, nothing. We start with the agreement. Arbitration is big neon sign up front in the agreement, it's part and parcel and so on and so forth. So your client agreed to that in the agreement and so on and so forth, putting aside the cause of action, but, you know, seems like he wants to distance himself and just says, I'm in Houston, I'm coming in Houston, disregard all that. So what do we do with the notion of making the parties abide by what they agreed to, whether they meant to or not? So you say the arbitration is inconsequential? No, Your Honor. We certainly agree that the parties all signed this agreement. However, the provisions of the arbitration agreement and the form selection clause are such at odds with each other, rendering them unenforceable. The language, I think it's important to note the actual language of these agreements. Section 12A of the agreement is what addresses, first states that any claims against FENTAC, all disputes, controversies, or claims arising out of or relating to this agreement, including any breach, invalidity, or interpretation of this agreement, any non-contractual obligations arising out of or in connection with this agreement, shall be finally adjudicated by arbitration under the London Court of International Arbitration. That's the first clause, Section 12A. There is also a clause, Section 14, that also states each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction in settling a dispute or claim arising out of or in connection with this agreement or its subject matter or formation, including non-contractual disputes or claims, except as to claims against FENTAC. And so it's FENTAC's position that those two clauses are directly at odds with one another and, therefore, cannot be harmonized. Now, this gets to the Sharpe case that is briefed in our brief and which the district court relied on in dismissing the case on foreign non-contractual disputes. But just in an initial proposition, I mean, it's written in order. So why isn't there a view that arbitration was the preferred initial door to go in, in arbitration? And you only get to 14 if, for some reason, the arbitration provision is against public policy, inherently unlawful, yada, yada, yada. But then, okay, any lawsuits in the U.K., et cetera. So why isn't there a reasoned view that arbitration was the primary thrust here? You get to 14, you know, suits in the U.K. if, for some reason, the arbitration provision is illegal. So my first question is, what inherently in 12, before setting out the arbitration, is there something inherently defective about 12A? Or is it only, is your argument only in trying to read it with the other provisions? But, I mean, in 12A itself, the arbitration provision, in other words, is it defective in terms of what it says? It, you know, just, it inherently can't be operable. Or is your argument, it's not that, but it's just you can't harmonize it with the rest? Well, I do believe that the agreements cannot be harmonized. But as far as the arbitration provision itself in 12A, we believe that the dispute in this case is outside the scope of that provision. Again, the causes of action filed are the Defense Trade Secrets Act and computer theft. Yeah, but if Mr. Horn hadn't been hired according to that agreement, you wouldn't have had the alleged theft, right? Well, Your Honor, the contract certainly spells out the history and why the parties are together. But if, there certainly would have been, again, under- It's a breach of the contract. It's a breach of extrinsic law. But, you know, the arising out of is extremely broad language. That's correct, Your Honor. However, the contract itself does not form the basis of the dispute. There's nothing in the contract that anticipated that Mr. Horn would be stealing trade secrets from FinTech. Well, you could have argued that it was a breach of the contract. That's correct, Your Honor. Those are not the claims, again, brought in the case, though. The claims were that regardless of the existence of the contract, someone broke into FinTech servers using this login information that was provided, which we believe under false pretenses, and stole trade secrets. That information, the servers were sabotaged, and by the time that FinTech was able to assess what had happened and determine what was going on, they filed a suit against Mr. Horn, who had immediately resigned after the data breach occurred. So as far as the contract itself, it certainly explains the history of the parties, why they're- I guess my, I guess the question I have is, I'm very skeptical that this is not covered by the arbitration agreement, but more interesting to me is, did the judge effectively rule that the agreement, he certainly ruled that the agreement was enforceable. Did he go the extra step in saying that it was not arbitrable? I don't believe he made that ruling in the underlying court. Or to the contrary, that it is arbitrable. I believe that the implied ruling is that it is. The motion to dismiss filed by Mr. Horn essentially objected to personal jurisdiction, subject matter jurisdiction, and venue in the court. He did not object and state that this is a matter for arbitration. It was, again, the court on its own motion, sui sponte, that filed, that entered into the forum non-convenience analysis. And based on that analysis, it was never briefed by any of the parties. And again, it was- Well, they did have sanction from the Supreme Court, didn't they? There is certainly that case. However, it's our position that existing Fifth Circuit precedent does require a movement seeking a dismissal on forum non-convenience grounds to file a motion. And also, Fifth Circuit precedent also states that in order for a court to dismiss a case on forum non-convenience grounds sui sponte, the procedure essentially must be fair. Carroll v. Fort James Corp is the case cited in the brief. Well, but there's some, you know, the notice issue is not inconsequential. But in the contract itself, it's not like the judge pulled forum non-convenience out of the air. I mean, it's in the contract. I mean, it's in there. So, I mean, there's notice in terms of it being there. It's not like, you know, you reached in the Louisiana Civil Code or somewhere and just got some concept. The parties agreed to it. You know, it's in the contract. It's in the, you know, sort of the default provision. So, to me, it's a hard argument to say I get it about notice that I'm going to decide it based on, but the forum non-convenience is not a strange concept because it's inherent in the document itself. Plus, there's a motion to dismiss the case. So, if it's a motion to dismiss based on jurisdiction, et cetera, it's there. So, I mean, and you can't on some notice that this could be teed up on any or a whole variety of grounds. Well, again, I think Fintech's position is that while there was certainly a dismissal pending, the grounds that were pled for by Mr. Horne never mentioned forum non-convenience. And they were not afforded a fair opportunity to brief that. And some of the cases cited by Mr. Horne in support of this, there were many, the facts are distinguishable in that the issue had been raised previously. And so, the sua sponte dismissal, the non-moving party at least had some notice. In this case, there was no notice given. And so, our position is it would be fundamentally unfair to require a non-movement to anticipate all possible rationale for dismissal that were never even briefed. I want to talk about jurisdiction. Yes. My understanding is the district court didn't, and we do not have to determine whether there is jurisdiction over Mr. Horne to dismiss for forum non-convenience purposes, right? I'm sorry, can you repeat that? We don't have to make an initial decision about jurisdiction over Mr. Horne's. If, in fact, to resolve the forum non-convenience issue. It doesn't matter. Correct, Your Honor. But, do we have to make a decision about jurisdiction over Mr. Horne to resolve the arbitration issue? Your Honor, I don't believe, again, the district court found that it had personal jurisdiction over Mr. Horne. I'm asking this court. Is that a prerequisite for us to decide the arbitration issue? I don't believe so, Your Honor. You don't? So, we can construe the arbitration agreement without resolving whether Mr. Horne is properly before the court? Yes, Your Honor, I believe so. No. That's personal jurisdiction. That's correct, Your Honor. I'm sorry. As far as the- I don't see how the court can decide forum non-convenience if it doesn't have jurisdiction over the parties. Well, again, Your Honor, I think our Fentech's position is that it does. The district court found that it did have personal jurisdiction over Mr. Horne. And in this case, again, that gets into his purposeful availment for the purposes of this case. The district court found, I don't believe there's any dispute, that Mr. Horne directed emails to Fentech, which is a Texas- Well, the question is, is that adequate? I mean, that's teed up in the case. Personal jurisdiction is that issue? Yes, Your Honor. And it's Fentech's position that personal jurisdiction, the court does have personal jurisdiction over Mr. Horne. He directed emails to Fentech, which he knew was a Texas corporation. He even met with Fentech in Texas, in the southern district of Texas. And so those contacts, it's our position- I thought your big server was in Texas. The server is in the United States. Fentech is a Texas corporation. And Mr. Horne directed emails to Fentech, which is a Texas corporation. So our position is that that amounted to a purposeful availment and allowed the court to have personal jurisdiction. Again, the district court did find that it had personal jurisdiction. And Mr. Horne also did meet with Fentech in Texas. He was personally in Texas. The remaining issue that we have not mentioned so far are the public and private interest factors relating to dismissal of the case. Again, these were issues that we never raised. This is the Atlantic Marine case. Whether or not the public and private interest factors weigh in favor of or against dismissal. It's Fentech's position that the factors weigh against dismissal. As stated previously, these are claims in this lawsuit brought under- So you want us to say that the district court erred in invoking the foreign non-convenience because it didn't give you notice. And so you want us to vacate and send you back so you can brief the private and public interest factors and wax out to the nth about foreign non-convenience. Is that what you? I mean, is that the relief? That's the relief we're requesting. Yes, Your Honor. We shouldn't do that if we disagree with you on the arbitration agreement. Again, we believe the arbitration agreement is in conflict and is unenforceable. That's my point. We can't remand unless we also agree with you on the arbitration agreement. If we disagree with you on the arbitration agreement, we don't remand. Yes, Your Honor. And it's Fentech's position that the arbitration agreement, again, is not binding. These claims in this case are beyond the scope of the arbitration agreement. You're saying that because they're brought under federal statutes? Is that why you're saying that all disputes doesn't cover this lawsuit because these claims are brought on the computer fraud and so forth? It's the conflict between 12A and 14 that is where our position is, is that those are in conflict. Well, I'm talking about the language in 12. 12 says except, you know, all disputes and controversies. I mean, that's broad. You said, well, it doesn't cover the claims made. The claims made are brought on federal statutes. I'm asking you, is your argument because the claims are brought on federal statutes and not some hearing agreement that that's why it's outside, even though, as Judge Jones asked, and I would say, obviously, the relationship to the parties here derived because of disagreement? Yes, we believe that the— Or is your whole argument about Section 12 because of your argument about if 12 and 14 are not harmonious? Right. Your Honor, I believe the argument is that 12 and 14 are not harmonious. And as far as the—it's just a public policy matter. Essentially, these are United States causes of action against the United States. Let me ask you a question. I mean, this is just, frankly, a garden variety of theft of trade secrets, although a very brazen one. And if you thought Mr. Horn was the perpetrator, and then he supposedly went out to compete against the company with some entity that he set up in England, wouldn't your normal remedy have been to go to the English courts and seek an injunction against his competition? Yes, Your Honor. However, the decision was made to bring the case in the Southern District to attempt to find relief there. Yeah, but, I mean, you didn't seek interlocutory— I mean, you know, temporary injunction relief, right? Well, there was an injunction initially in this case here in the United States. It was not in the U.K., however. That doesn't do much good when the defendant's in the U.K., does it? That's correct, Your Honor. Interesting. Okay. Thank you. All right. You've saved your rebuttal. Ms. Miller? You're up. May it please the Court. My name is Elyse Miller, and I'm here today on behalf of the appellee, Ralph Horn. I'd like to discuss two issues today with the Court, the first being whether or not the arbitration agreement issue is valid. The appellants in this case have argued that the sole basis— the sole basis that appellants argue that the agreement is not valid is because they contend that Section 12a, the arbitration provision, conflicts with Section 14, the Choice of Law, Jurisdiction, and Venue provision. The second issue I'd like to discuss today with the Court is the scope, and that is whether or not FinTech's disputes fall within the scope of the arbitration provision. You're not contesting now that your client is subject to the jurisdiction of the federal court? No. That is still our position, Your Honor, that personal jurisdiction hasn't been satisfied because the context that FinTech's alleges do not satisfy the purposeful availment standard. Did Horn meet with FinTech in the Houston area? That's correct, Your Honor. On FinTech business? On cross—so Horn met with Marcus Andrade on cross-verified business in Texas. That is correct. The relevant context that FinTech—or the context that FinTech has cited to is phone calls and an email that was sent regarding requesting the— Well, they said—he just said in argument, and I do mention briefly in their brief, that they say Horn met with FinTech on FinTech business in Texas. That's correct, but those contexts do not—are not the intentional act that FinTech's claim serves the basis of the personal jurisdiction. Like stealing. Exactly, Your Honor. We have two points— How can you have theft of trade secrets from a Texas-based company that's not directed at Texas? Because what happened here is the—the context that are relevant for the inquiry is where the hacking—alleged hacking occurred, and it's undisputed that that was not in Texas. We don't know where the servers were located, other than that FinTech has made the statement that they're somewhere in the United States. But it was— You know what? If my pearls are in a safety deposit box in New York, but I live in Houston, and you know they're my pearls, and you get into it and steal them, that's still directed at me. I'm the victim, not the pearls. I—I agree with you that the harm is directed at you in that circumstance, but I don't think that the context that we're talking about— What's your best case? The best case is something that we cited to in our reply brief, and I'm drawing a blank at the name, but it was the Nevada case where there was—the DEA officer seized money from someone, and the court in that case found—the original trial court said that there was personal jurisdiction in Nevada, but on appeal, the courts reversed that decision and said that there wasn't any evidence that the defendant knew that the harm would be suffered there, and so that's why the court determined that there wasn't personal jurisdiction. You knew, but they knew the server was—he knew, Horn knew the server was somewhere in the United States. There's no evidence to record that Horn knew where the server was. That's the evidence that has been put in the record after the fact that this is where the server was located. Horn had no idea where the server was. He didn't have the keys until he finagled them. But he did make a phone call, allegedly, to Texas to get the code to get into the server. Well, the phone call that was made was directed to Marcus Andrade. Now, Marcus Andrade— the evidence that's undisputed in the record is that Marcus Andrade was an international traveler. Horn, during his employment, had no idea where Mr. Andrade was at any given time. The communications were made on a cell phone. He knew he was tied to the company, and he was trying to get to the company's server, and he called Mr. Andrade—I can't pronounce his name—to get access to the server, which he knew was owned by a Texas company. You are—that is correct. That is what the record shows. That's correct. But our position is that even though those contacts are alleged, those are not sufficient under the personal jurisdiction analysis, because those claims in and of themselves do not give rise to the torts that FinTech has brought. The Computer Fraud and Abuse Act and the Defend Trade Secrets Act, the relevant inquiry is the actual accessing of the server, and that was not done in Texas, and there's no issue—or there's no even allegation that that was done in Texas. Regardless of the— Is there evidence that it was done in the United States? There is an—well, there's evidence—it's our position, especially when you get to the 4K2 part of the inquiry, that— Where was the server? What does the evidence say about where the server was? The only evidence in the record is that it was somewhere in the United States. So then why doesn't—why don't the Rules of Civil Procedure kick in then? I'm sorry? What about the Rules of Civil Procedure that says if you can only establish it's in the United States, then you've got personal jurisdiction? So our position is it's—the fact that FinTech kind of laid behind the log and never explained where—never stated the server is in this state, if there would have been an allegation that the server was in this state and there were credible facts to support Horn hacking into that server, jurisdiction would have been proper in that state. You say it wasn't because Horn didn't know where it was. I'm saying that the—under the traditional personal jurisdiction analysis, where we're looking at Texas, Horn did not purposely direct any activities to Texas because the server was not located in Texas. As it relates to 4K2, the appellant has an obligation to say that there are no—that no states in the United States could assert jurisdiction. They could have satisfied that burden by simply telling us the server is located in whatever state it was. But instead, they— And you would say, well, he didn't know where the server was, so we don't have jurisdiction there. No matter—your allegation that he didn't know where the server was means he can't have specific jurisdiction in any state regardless of where the server was located because he didn't know where it was. So your own argument seems to me—sinks you. If you insist that he had to know where the server was to get specific jurisdiction in any state, and you say he doesn't know where it was, that means you can't get specific jurisdiction over him in any state. But if there's evidence that the server was in the United States, you can get jurisdiction to—seems to me under 4K2. Right. Let me—let me clarify that. It's not—our position is not that because he didn't know where the server was, there isn't jurisdiction. Our position is that he did not—he didn't—the allegation is not that he hacked into a server in Texas. It's that he hacked in—so there's no contact with Texas as it relates— There's no contact with any other state either under your analysis because he didn't know where the server was. If—it would have been—the fact that he didn't know isn't what's relevant. It's—he doesn't— Do you not see you're meeting yourself coming? You're saying you cannot get jurisdiction over him in any state because regardless of where the server was located, he didn't know where he was trying to hack. And I'm sorry, Your Honor, let me clarify my position. My position is if there was evidence in the record that he hacked into a server in a particular state, that would be sufficient to get personal jurisdiction in that state. But we don't have that evidence in the record because FinTech did not identify what state that— You're saying your client didn't know where the server was so he couldn't—no matter where the server was, he could never have had a specific intent to hack into the server in any specific state. Therefore, there's no specific jurisdiction in any one state. That's your argument. That's—Your Honor, and I apologize if I've not been clear, but that's not my argument. My argument as it relates to specific jurisdiction in Texas is that there's no evidence that he intentionally hacked the system in Texas because the server wasn't in Texas. With regard to 4K2, my position is— Where did he intend to hack? I don't know the answer to that, but the only reason I don't know the answer to that is because FinTech has not— You must know what the intent of your client was to hack. I mean, what's—the allegation was he hacked the computer. You're saying, but he didn't know where it was, unequivocally. You're right, Your Honor. I don't know where it is, but the reason why I don't know— You're saying the client didn't know where it was. That is right. So it doesn't matter where it was because, under your theory, he could never have intent to hack into any particular state. Therefore, there's no specific jurisdiction over him in any particular state. The case law that I relied on in my brief says that if—regardless of whether or not someone knew where the server was located, if a defendant hacks into a server and is not authorized to, where that happened, the court has personal jurisdiction. I thought you said it mattered what your client's knowledge was. When I'm talking about where their knowledge is, I'm talking about the specific context as it relates to the emails and the phone calls. You know, the fact that they may have specific jurisdiction in the state where the server is located shouldn't, in my view, negate the possibility that there is also specific jurisdiction in Texas founded on these other contacts. Your Honor, I don't— I'm assuming you're going to say the same thing. Why don't you shift back up there? Because the question was predicated on, you know, we'd have to determine the jurisdiction that you're running out, and you said you want to deal with arbitration and the scope. So let's go back up, then, if there's time left, and come back to jurisdiction. Absolutely, because even if the court disagrees with me on personal jurisdiction, the court was correct when it dismissed the case on form non-convenes grounds. The appellant has argued that the Section 12a irreconcilably conflicts with Section 14, and that because of that conflict, both provisions should be struck and neither should be enforced. That argument is contrary to what the Fifth Circuit—the principle of SHARP in the Fifth Circuit. What SHARP generally stands for is the proposition that to the extent that two provisions conflict, it's the court's job to reconcile them so long as both provisions have some meaning. We can reconcile Section 12a and Section 14 so that both provisions have meaning. Section 12a is the arbitration provision, and there's four categories of disputes that are subject to arbitration. Section 14 provides that English law will govern the party's agreement—the subject matter of the agreement—in the formulation of the agreement. It also provides that disputes arising out of or relating to the agreement, its subject matter, or formation will be resolved in English and Wales. We can harmonize that by saying that the courts of England and Wales will resolve issues of arbitrability. They will also be asked to decide issues that are not subject to arbitration or were the party's way of arbitration. Section 12a can be reconciled to say all disputes that the courts of England and Wales decide fall within the scope of arbitration will be decided in that form. Interpreting in that manner gives effect to each provision. If we go with what FinTech argues, both provisions would be struck down. And there is—it is clear that that was not the party's intent. And if you—you can tell what the party's intent by looking at the fact that in multiple places, both in the arbitration agreement and in Section 14, they cite to English law. They also have this two-tier system where all disputes except for those against FinTech will be resolved in arbitration. And then claims asserted against FinTech, those will go to jams arbitration here in Houston. If you look at that system that the parties agree to, it is clear that arbitration was the method for resolving the disputes. If the court disagrees with that harmonization, the remedy is not to strike both provisions. The court's job is to ascertain the party's intent. It's not—it's clear that the party's intent wasn't that neither 12A or 14 would apply. And if you look at the case law that we cited for that proposition, for example, we cite a case out of the San Antonio Court of Appeals where they were asked for a provision or for a contract that had the FAA governing the dispute and also the Texas Arbitration Act. The court said, okay, here's a situation where we can't reconcile those two provisions. The FAA is opposed to the Texas Arbitration Act. But we see that that dispute is governed under Texas law, and we see that the dispute does not involve issues of interstate commerce. Because of that, it was the party's intent to have the TAA govern and not the FAA. So what the court in that case did was strike the FAA provision and enforce the TAA provision. Similarly, in an English court that I cited, the court was looking at whether a two-year or a three-year music contract should apply. And the court said, look, if we can't harmonize these two provisions, we're going to have to enforce one of them. And in that case, they enforced the two-year provision. With regard to—so when you get to the scope issue, once you determine that the parties have—that the agreement itself is valid, if that determination is made, you actually don't get to scope because the parties delegated that issue to the courts of England and Wales. The appellant has made an argument in their brief that, well, if the issue of scope is wholly meritless, then it's still the court's job to make decisions regarding scope. But that decision was just recently—that holding was just recently struck down by the U.S. Supreme Court in the Henry Schein matter. If there is a—if the court has delegated the issue of arbitration—or, I'm sorry, if the parties have delegated the issue of arbitration— Arbitrability. Thank you. Thank you, Your Honor. Then that delegation is given effect. If we look at the issues of scope, though, it is clear that this dispute falls within the scope of arbitration—of the arbitration provision. The arbitration provision is not just claims that arise out of or relate to the agreement. It—there's four different parts of that. Yes, it is claims that arise out of or relate to the arbitration agreement—or the agreement, but it is also noncontractual obligations related to the agreement. Mr. Horne's role as the president—or, I'm sorry, the CEO of the company in his responsibilities and duties as the president—the case that they decided for the proposition that these claims do not arise out of or relate to the agreement, the Ford case, the Ford case, that contract didn't relate to the subject matter of the dispute, where the contract itself in this case is about Fintech's obligat—or, I'm sorry, Horne's obligations as it relates to Fintech's trade secrets. That's the exact subject matter of the two statutory causes of action that have been asserted. So that makes the Ford case different. It's certainly related to Mr. Horne's noncontractual obligations as it relates to trade secret protections, and it's related in the—the dispute is also related to Mr. Horne's duties and responsibilities as the CEO. He would never have had the ability to get the password for the server, as they allege, if not for the fact that he was the CEO of the company. So because of all these issues, or because of all these facts, the dispute that has been brought before us is certainly within the scope of the arbitration provision. Briefly, I'd like to address the due process argument. Ultimately, you argue, if we could poll the arbitration, to the extent that scope isn't clear, that that would be discerned by the U.K. Court. Exactly. That's our position, Your Honor, is that it's the U.K.'s decision to determine the issues of arbitrability, which—including scope. So if the court disagrees with that, though, scope—this dispute is within the scope of the party's agreement. Briefly, in the last minute that I have, I wanted to address due process. The United States Supreme Court in the Chambers v. NASCO case said that it's the inherent power of the district court to dismiss a case on foreign nonconvenience grounds. That decision has been interpreted by other courts to stand for the proposition that the court has the power to dismiss the case on foreign nonconvenience grounds, sua sponte. You understand we do have cases that say, you know, in a foreign nonconvenience, that notice is the general—in other words, the party should be given notice for the reasons mentioned, right? Sure. I understand that position, but— We've got cases where we've sent them back because no notice was given and so forth. You acknowledge those cases, right? Or are you just relying on—we know what Chambers says, but I'm talking in this context. Sure. And if you— Go ahead. You look at what the party gaming case said, that Sixth Circuit case said, where the defendant had just filed a motion to dismiss on venue. It did not move on foreign nonconvenience, and the court granted sua sponte on the foreign nonconvenience. That court said, look, the foreign nonconvenience is just a supervening venue provision, so all of the issues that were relevant in the improper venue motion to dismiss are relevant here. And that's exactly what we have in this case. It wouldn't make a difference because the parties briefed all of the issues related to whether the arbitration agreement is enforceable. And as I heard an appellant's counsel say in front of you a few minutes ago, that the private interest factors did weigh in favor of dismissing—that wasn't their basis for appeal. It was just the fact that they hadn't argued about the public—I'm sorry. I think I said that backwards. The public interest factors did weigh in favor of dismissing the case. It was just the fact that he hadn't brought—that they hadn't had a chance to argue about the private factors. But we never get to that because the forum selection clause, the arbitration provision, is valid. Okay. Covered a lot. Thank you, Your Honor. Your Honor, regarding the Ford case, I believe it's important to note the language that this court found—that ruled in that case. This court held that a noncontract claim is arbitrable if it is so interwoven with the contract that it could not stand alone. But it is not arbitrable if it is completely independent of the contract and could be maintained without reference to a contract. And in this case, the situation we have is Horne appropriated trade secrets from FinTech servers. That was not anticipated by the contract. There was certainly a contract that existed, but that was not a—it did not spring from the contract. But the agreement assumes that a lot of things may not be anticipated. That's why it's broad-language, all disputes. There's no indication the parties sought to delineate the length and breadth of what disputes were or were not in some exclusive list. But that's not atypical for a contract to have some broad, encompassing language. But you seem to want to argue because this is something that's not expressly mentioned in here. Ergo, it couldn't be that's so distanced from this agreement that it can't be read that this was anticipated? Yes, Your Honor. In fact, that gets back to the language in the Ford case as well. In the Section 12a agreement, it is certainly broad-language, all disputes, controversies, and claims arising out of or relating to the agreement. The language in the Ford arbitration provision also was broad, any controversy or claim arising out of or relating to the agreement. And in the Ford case, even with that broad arbitration language, the Court determined that the claim was not arbitrable and it was allowed to proceed in litigation. Also, regarding the general, I think, policy argument, if arbitration is the only remedy for FinTech in this case, we're talking about going to England to arbitrate claims under United States statutes. We're also talking about arbitrating a claim for theft of trade with servers based here in the United States. But what? I mean, the parties opted, you know, in their agreement. I mean, the Commercial Court in the UK deals with all kinds of international agreements that arise in New York and other places. I mean, there are tons of cases that are tried in the Rolls Bill and in the UK because parties opt the UK as the formal choice and so on and so forth. I mean, you get your point, but I mean, why does that answer it? The only answer, where the parties here elected in the agreement, you know, the UK as the source. Houston was in the default position, the fallback position. If these other provisions are struck, deemed invalid, et cetera, I mean, it says B, fallback provisions if arbitration clause is invalidated. Then you get to 12D, where we even get out to. And then it says, you know, the parties agree not to object to adjudication in Houston on grounds of foreign nonconvenience. So, I mean, it's put in here as a fallback provision if the arbitration piece is deemed invalid. So, come back to where I started. I mean, what's inherently invalid about the arbitration provision when that's what the parties opted to want to do in the UK? Well, again, Your Honor, I think our fintext position is that the causes of action brought here did not arise from the agreement. This is not a breach of contract case. A breach of fiduciary duty case is a case brought under the... You're consistent with your answer. Yeah, I'm sorry? I just say you're consistent with your answer. Yes, Your Honor. Also, finally, just regarding briefly the public and private interest factors, our position is that neither the public or private interest factors support dismissal in this case. Again, generally speaking, fintext is an American company, as stated before, with the servers located in the United States. The analysis identifying Horn as the responsible party and the witnesses relating to that are in the United States, and many fintext witnesses and the damages are in the United States. As far as the public interest factors, again, I believe those weigh also in favor of maintaining the case here, ensuring the United States certainly has a substantial interest in ensuring that American courts can enforce American laws relating to the theft of intellectual property from an American company in the United States. All right. Thank you. All right. The argument on both sides. Interesting case, to put it mildly. The case will be submitted. That's the last argued case for the day. The panel will stand in recess until 9 a.m. tomorrow.